IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

DONALD E. GEHLKEN and          )
CAROLE GEHLKEN,                )
                               )     C/A No.: 2:03-3935-DCN
        Plaintiffs,            )
                               )
    vs.                        )
                               )
MCALLISTER TOWING &            )     **ORDER and OPINION**
TRANSPORTATION CO.             )
AND DETYENS SHIPYARDS, INC.    )
                               )
        Defendants.            )
_____)

Plaintiffs Donald E. Gehlken ("Gehlken") and Carole Gehlken filed this suit

pursuant to general maritime law seeking to recover damages for injuries Gehlken claims

to have sustained as a result of allegedly negligent conduct by defendant Detyens

Shipyards, Inc. ("defendant")[1] at its Wando River shipyard in Charleston, South Carolina.

The case was tried before this court, sitting without a jury, on March 15-17, 20-23 and

May 23, 2006. Based upon the evidence presented and the applicable law as set forth

below, the court makes the following findings of fact and conclusions of law.

**I.      FINDINGS OF FACT**

1.      Gehlken was born on April 28, 1944.  Donald and Carole Gehlken have

been married for forty-one years.  (Tr. 6.)

2.      Since August 2001, Gehlken was employed as a diesel mechanic and

vessel repairer in the Shore Side Maintenance Division of  McAllister Towing of

_____

[1] Although plaintiffs sued both Detyens and Gehlken's employer McAllister,
this trial involved only Detyens' alleged negligence in causing Gehlken's injuries.
Therefore, when this opinion uses the word "defendant," it is referring only to
Detyens.

Charleston, Inc. ("McAllister Towing").  (Tr. 550-51, 584, 674-75.)  Gehlken's job duties required him to spend the majority of his time repairing McAllister's fleet of vessels based in Charleston, South Carolina.  (Tr. 585, 674.)  Prior to 2001, Gehlken had experience with line handling, (Tr. 675), but had never handled any lines in connection with dry-docking a vessel.  (Tr. 676.)

3.    On January 28, 2003, a McAllister tug, the M/V BARBARA MCALLISTER (the "tug"), was scheduled to be repaired at defendant's dry-dock on the Wando River.  (Tr. 589, 796; Pls.' Ex.12-A; and Def.'s Ex. 4.)  The tug was initially scheduled to depart from McAllister's dock between 9:00 A.M. and 9:30 A.M. so that she would arrive at the dry-dock around slack low tide.  (Tr. 549-50, 591.)  According to the tide chart for January 28, 2003, slack low tide was around 11:15 A.M. (Pls.' Ex. 4.)

4.    The tug's crew consisted of Captain Eddy Richardson ("Richardson"), engineer Daryl Moore, and deckhand Gary White ("White").  (Tr. 590, 686, 794-95.)

5.    On the morning of the dry-docking, Gehlken and his supervisor Tony Davis ("Davis") boarded the tug to repair the tug's main engine because it would not start.  (Tr. 589, 685-86, 787-88.)  At approximately 1:00 P.M. on January 28, 2003, the tug departed with Davis, Gehlken, and her three crew members on board for the voyage to defendant's dry-dock.  (Tr. 590 and Def.'s Ex. 4.)

6.    Before the tug arrived at the dry-dock, Richardson had a brief VHF radio conversation about the dry-docking procedure with Lance Lovell, Detyens' dry-dock superintendent ("Lovell").  (Tr. 788, 1079-80.)  During this conversation, Lovell never indicated to Richardson the number of lines that were going to be thrown from the dry-dock to the tug, where the lines were going to be thrown from, where the lines were

-2-

going to be thrown to, or when the lines were going to be thrown.  (Tr. 797-98,1079-81.)
However, Richardson testified that according to the usual procedure, once the tug broke
the plane of the dry-dock, defendant's line-handlers would start passing lines.  (Tr. 790.)
There was no evidence that Gehlken was ever informed of the dry-docking procedure or
of the line handling procedure.  This is not unusual since Gehlken was essentially a
"passenger" on this voyage whose duties were to repair the tug's diesel engine if it failed
to operate.

       7.      The tug approached the dry-dock at around 2:30 P.M. for the dry-docking,
a process that takes approximately two hours to complete.  (Tr. 791, 954 and Def.'s Ex.
4.)

      **a.**      **The tug's physical characteristics**

       8.      The tug's aft deck is a large open area behind her "house" or
superstructure.  (Tr. 463.)  The aft deck is at least thirty feet long and between twenty to
twenty-five feet wide.  (Pls.' Ex. 7-B, 7-C, and 7-D.)  The raised portion of the deck near
the stern is called the drying-rack.  (Tr. 328, 593; Pls.' Ex. 7-B, 7-C and 7-D.)  A main
towing bit and capstan are located near the house and a smaller aft towing bit is located
immediately forward of the drying-rack.  (Tr. 326, 328-30, 594; Pls.' Ex. 7-B, 7-C and 7-
D.)  The main towing bit is centered between the port and starboard sides within several
feet of the house.  (Tr. 329-30, 594; Pls.' Ex. 7-C, 7-D.)

      **b.**      **The dry-dock's physical characteristics**

       9.      Detyens' dry-dock consists of a flat deck and two large metal wing walls
that extend up from the deck.  (Tr. 438, 905; Pls.' Ex. 8-A, 8-B, 8-C, 8-D, 8-E, and 8-F.)
The wing walls are identified as the west or starboard wing wall and the north or port

wing wall. (Tr. 438.) On top of the wing walls is another deck or catwalk. (Tr. 440; Pls.' Ex. 8-G.) Extending from the top of the wing walls are a series of poles that have loud speakers attached to them. (Tr. 440-41; Def.'s Ex 7; Pls.' Ex. 8-B, 8-C, 8-F, and 8-G.) The speakers are part of a public address system that was not functioning on the day in question and, hence, was not utilized by defendant to communicate with the tug. (Tr. 440, 826, 852, 1050.)

### c.     The dry-docking of the tug

10.     In order to dry-dock the tug, it was necessary to exchange a series of lines between the tug and the dry-dock. As the tug backed into the dry-dock and crossed the front edge, or apron, of the dry-dock, Detyens took control over the tug's movement and was responsible for the safe docking of the tug. (Tr. 802.)

10.     The general procedure for dry-docking a tug at defendant's dry-dock is as follows. Defendant's line-handlers control the vessel as it enters the dry-dock by advancing heavy lines to the vessel through the use of smaller, 3/8" heaving lines equipped with a "monkey's fist." A "monkey's fist" is a lead weight covered with rope. (Tr. 930, 932.) Detyens' line-handlers advance the heavy lines to the tug's crew by tossing the heaving line and monkey's fist underhand onto the deck of the tug. (Tr. 837-38, 933.) Once the monkey's fist hits the deck of the tug, the tug's crew pulls in the heaving line, which is attached to a heavier mooring rope. The mooring rope is then secured to one of the bits on the tug, and the line-handlers on each side of the wing walls control the stern of the tug as it backs in. Meanwhile, the bow is controlled by a push-boat until mooring lines can be attached to the bow in the same manner. (Tr. 935, 937-41.)

11.    At trial, Lovell admitted that defendant did not conduct a pre-dry-docking meeting with the tug's operator to discuss: (1) the docking of the tug in the dry-dock, (2) at what point during the dry-docking the monkey's fists were going to be thrown by defendant's employees, and (3) the area on the tug where monkey's fists were supposed to land.  (Tr. 1080-81.)

12.    A monkey's fist should be thrown so that it lands well away from anyone standing on deck.  (Tr. 414, 460-61, 821-22, 849-50, 1075.)  Under defendant's procedures, a monkey's fist should not be thrown until the line handler who is going to throw the monkey's fist warns the person receiving it by making eye contact or yelling that the monkey's fist is going to be thrown and the person located on the tug appears ready to receive the monkey's fist – either by eye contact, nodding his head, or moving out of the way. (Tr. 461, 823-24, 848, 945,1053-56.)

13.    According to Detyens' employees Andrew Saunders ("Saunders"), Garrett Graham ("Graham"), and Lovell, defendant does not instruct its employees to wait for the person located on the tug to yell, communicate via radio, or provide hand signals that he is ready to receive the monkey's fist. (Tr. 823-24,849, 945, 1053-54, 1056.)  Instead, Lovell, Saunders, and Graham testified that a mere glance in the direction of the line handler responsible for throwing the monkey's fist is all that is necessary before the monkey's fist can be thrown from the dry-dock to the tug. (Tr. 823-24, 848-49, 945, 1053-54, 1056.)

14.    Detyens' employees Joe Alston ("Alston") and Saunders were the line handlers responsible for throwing the heaving lines to the stern of the tug.  (Tr. 447, 835.)  According to their testimony, they try to throw the monkey's fist so that it will land on

the tug's drying rack near the smaller aft towing bit.  (Tr. 450-52, 456-57, 833-34, 846-47.)

     **d.**     **Throwing of the monkey's fist that struck Gehlken**

     15.     Gehlken testified he was standing near the main towing bit as the tug entered the dry-dock.  (Tr. 687-89.)  His position was fifteen (15) to twenty (20) feet away from the drying rack.  (Tr. 606-07, 854.)  The drying rack and the small aft bit are defendant's line handler's target for the monkey's fist.  (Tr. 351-52.)  In accordance with the testimony of Davis, Lovell, Saunders, Alston, and plaintiffs' line handling and liability expert Captain Richard Frenzel ("Frenzel"), Gehlken's position near the main towing bit provided the line handlers with plenty of room to safely throw the monkey's fist so that it could land on the deck of the tug without striking him.  (Tr. 356-57, 362, 462-64, 606-07, 854, 1072, 1075.)

     16.     During the transfer of lines from the dry-dock to the tug, Gehlken was struck in the head by a lead weighted monkey's fist thrown by one of defendant's line handlers.  (Tr. 561, 607, 691-92.)  Gehlken testified that at the time he was struck in the head he was standing near the main towing bit and well away from the drying rack.  (Tr. 690-91.)  Although each of defendant's line handlers denied throwing the monkey's fist that hit Gehlken, this court finds that in accordance with the testimony of Lovell, Alston, Saunders, and Frenzel, defendant violated its own safety procedures by not warning Gehlken, by not making sure Gehlken was ready to receive the line, and by hitting Gehlken in the head with the monkey's fist.  (Tr. 368-69, 414, 461-62, 850 1061-62, 1075, 1111-12.)

17.    Davis testified that he was standing near the smaller towing bit and drying rack at the time Gehlken was hit in the head but that he did not know exactly where Gehlken was located when he was struck nor did he see him hit by the monkey's fist. (Tr. 593-97, 600-02.)  Davis further testified that a monkey's fist was thrown to him and it landed several feet away from him near the smaller towing bit and drying rack.  (Tr. 596, 606.)  According to Davis, after he retrieved the monkey's fist thrown to him, he saw Gehlken standing near the main towing bit.  (Tr. 593, 593, 595, 600, 601, 602.)  Davis testified that Gehlken said he had just been hit with a monkey's fist.  (Tr. 598, 599, 601, 602.)

18.    Although Gehlken stated that he "glanced up at the fellows on the wing wall," (Tr. 732), defendant did not offer any evidence that any employee made eye contact with Gehlken before the monkey's fist was thrown, nor that Gehlken acknowledged he was ready to receive a monkey's fist, nor that he ignored any warning that the monkey's fist was going to be thrown to or near him.

19.    Gehlken testified that shortly before he was hit he "heard somebody yell duck," but he did not know who or where the warning came from.  (Tr. 691.)  Gehlken did not hear anybody yell "heads up."  Since he was standing well away from the "target area," Gehlken did not expect a monkey's fist to be thrown anywhere near him.  (Tr. 695-96.)  White's testimony supports Gehlken's testimony that defendant's line handlers did not provide any warning before throwing the monkey's fists.  White testified that a monkey's fist was thrown to him on the bow of the tug by one of defendant's line handlers without any sort of verbal warning.  (Tr. 554-55.)  Although Davis was given a "heads up" warning prior to receiving a line on his side of the tug, (Tr. 603, 619, 626-27),

Davis did not hear any of defendant's line handlers yell "heads up" or provide any warning to Gehlken before throwing the monkey's fist.  (Tr. 604.)  Defendant did not present any evidence that it provided any warning to Gehlken that a monkey's fist was going to be thrown to him nor that Gehlken acknowledged he was ready to receive the monkey's fist.

20.     White and Davis both observed that Gehlken had a red mark on his forehead where he had been hit with the monkey's fist.  (Tr. 561-63, 607-08.)

21.     After being struck in the head, Gehlken had a headache, began to have vision problems, was nauseated, and had to pull off the road several times as he drove home that evening.  (Tr. 23, 699-700.)

**e.     Gehlken's injuries**

22.     The day after he sustained his injury, Gehlken was seen by his family physician, Dr. William Wilson.  Gehlken told Dr. Wilson that he had suffered a head injury the previous day.[2]  (Def.'s Ex. 16.)  Dr. Wilson's physical exam revealed an abrasion over the right parietal area of the skull, and he testified at trial that Gehlken's symptoms included headaches, blurred vision on the right side, nausea, and difficulty with balance and double vision.  (Def.'s  Ex. 16; Tr. 147-48.)  Dr. Wilson diagnosed Gehlken with "head trauma with probable concussion." (Tr. 149.)

23.      On February 18, 2003, Gehlken returned to see Dr. Wilson and continued to report a visual deficit from the right eye, headaches, and difficulty with memory and

---

[2] While the hand-written nurse's note contained in Defendant's Exhibit No. 16 states that Gehlken sustained a head injury to the left side of his head, this appears to be an error.  The rest of the doctor's notes correctly refer to the right side of the forehead as the injured area.

recall.  (Tr. 152-53.)  As a result of his ongoing symptoms, Dr. Wilson referred Gehlken

to neuropsychologist Dr. L. Randolph Waid to determine if Gehlken had suffered any

injury to his brain.  (Tr. 154.)

   24. On March 10, 2003, Gehlken saw Dr. Waid for a neuropsychological

evaluation. (Tr. 243.)  Gehlken complained to Dr. Waid of ongoing difficulties with

headaches, dizziness, attention/memory functioning and blurred vision.  (Tr. 246-48).

Dr. Waid initially diagnosed Gehlken with post-concussive syndrome caused by the head

trauma he received when he was hit by the monkey's fist.  (Tr. 249.)

   25. Gehlken continued to complain of chronic headaches, photophobia,

dizziness, visual disturbances, tinnitus, and balance problems.  (Tr. 251.)  Gehlken also

complained to Dr. Waid of concentration difficulties and memory lapses.  (Tr. 253-54.)

   26. Because of Gehlken's ongoing visual disturbances, Dr. Wilson referred

him for a neuro-ophthomologic examination at the Medical University of South Carolina.

On December 5, 2003, Gehlken was seen by Dr. Aljoeson Walker, Assistant Professor of

Neurology and Opthomology.  (Tr. 473-84.)  Dr. Walker testified that Gehlken reported a

head injury, constant headache, and ongoing vertigo.  (Tr. 484-85.)  Dr. Walker

conducted a neuro-opthomologic examination and diagnosed Gehlken with pseudotumor

cerebri ("PTC") and increased intra-cranial pressure.  (Tr. 487.)

   27. Because of the increased intra-cranial pressure, Dr. Walker performed a

spinal tap which confirmed his diagnosis of post traumatic PTC.  (Tr. 489.)  Although Dr.

Walker is not board certified, he has diagnosed PTC more than four hundred times and

manages ten to fifteen patients who suffer from PTC every week.  (Tr. 476.)  Dr. Walker

testified that, to a reasonable degree of medical certainty, the PTC was caused by the

trauma to Gehlken's temple.  (Tr. 498-99.)  He further stated that the constant low level

headache, blurred/double vision, and the dramatic improvements Gehlken showed after

the spinal tap were all consistent with his diagnosis that Gehlken was suffering from

PTC.  (Tr. 490.)

28.     Dr. Walker continues to treat Gehlken in order to manage his PTC.  (Tr.

508.)  At trial, Dr. Walker opined that Gehlken will need continued neurological and

psychological intervention, including the use of medications, to sustain him at maximum

medical improvement and to avoid any deterioration in function.  (Tr. 508.)  In addition

to Diamox (the medication used to control intra-cranial pressure), Gehlken will also

require other medications, including anti-depressants.  (Tr. 532-33.)

29.     Dr. Curtis Worthington is board certified in neurological surgery and he

has practiced neurosurgery for twenty years.  (Tr. 1001).  Dr. Worthington testified that

he has assisted in the diagnosis and treatment of eight to ten patients with PTC, and he

has performed surgery on patients diagnosed with PTC.  (Tr. 1001-02.)  Although Dr.

Worthington disagreed with Dr. Walker's diagnosis of PTC, Dr. Worthington opined, to

a reasonable degree of medical certainty, that Gehlken was not a candidate for surgery to

install a VP shunt to relieve the intra-cranial pressure.  (Tr. 1008, 1011.)

30.     Gehlken cannot work in environments that involve climbing, heights,

uneven surfaces, the operation of hazardous machinery, or prolonged walking or

standing.  (Def.'s Ex. 23; Tr. 507.)  Gehlken should avoid situations where his balance

problems would cause a safety issue.  (Tr. 507.)

31.     Gehlken has a history of periodically passing kidney stones, but after he

started to take Diamox as prescribed by Dr. Walker for PTC, he became a chronic kidney

stone maker. (Tr. 681-82). Diamox can cause an increased production of kidney stones. (Tr. 501, 508.) Gehlken now passes kidney stones on an almost daily basis; the passing of stones is extremely painful and causes him to be very tired. (Tr. 678-79).

32.     Dr. Waid testified at trial that Gehlken has sustained permanent impairment to his central nervous system as well as mental and behavioral disorders. (Tr. 270.) Dr. Waid opined that as a result of his head injury, Gehlken has a twenty percent (20%) impairment of the whole person due to residual neurocognitive impairment. (Tr. 270.)

33.     In addition to the injuries sustained as a direct result of the impact of the monkey's fist, Gehlken also sustained an injury to his right shoulder and arm. (Tr. 708-09.) Because his head injury causes him frequent dizziness, Gehlken fell at home. (Tr. 174, 708.) He initially received medical treatment for the fall from Dr. Wilson, who diagnosed him with a possible tear in his right rotator cuff and referred him for further evaluation to Orthopaedic Specialists of Charleston. (Tr. 174.) Gehlken has undergone physical therapy for his injured right shoulder. (Tr. 175.)

34.     Gehlken continues to be treated by Drs. Walker, Wilson, and Waid. (Tr. 182-83, 273, 508.)

35.     As of the date of trial, Gehlken remains symptomatic with the following conditions directly caused by the injury he sustained from the monkey's fist: (1) chronic imbalance and vertigo; (2) visual disturbance of the right eye; (3) chronic severe headaches; (4) right arm/shoulder pain; (5) cognitive impairment affecting memory and concentration; (6) depression; (7) dramatic increase in the Diamox related formation and

passing of painful kidney stones; (8) brain injury; and (9) PTC.  (Tr. 28, 30-40, 42-46, 705-08, 710-11, 714-16.)

36.    As a result of all of the injuries set forth above, Gehlken has been rendered permanently and totally disabled and will require ongoing medical care and treatment for the remainder of his life.

## II.    CONCLUSIONS OF LAW

Based on the testimony of all of defendant's employees and all line handling experts, including defendant's expert New, defendant was negligent when its employees hit Gehlken with a monkey's fist.  A properly thrown monkey's fist should land several feet away from anyone on deck.  In throwing the monkey's fist from the dry-dock to the tug, defendant had a duty to: (1) properly warn Gehlken that the monkey's fist was going to be thrown, (2) not throw the monkey's fist until Gehlken acknowledged he was ready to receive it, (3) wait for Gehlken to move away from the area where the monkey's fist was going to be thrown, (4) throw the monkey's fist so that it landed well away from Gehlken, and (5) not hit Gehlken with the monkey's fist.  A failure to follow these precautions was a breach of defendant's duty to Gehlken.

This court further finds that it was completely foreseeable to defendant that Gehlken could be injured by its failure to warn him a monkey's fist was going to be thrown and its failure to prevent the monkey's fist from hitting him.  Defendant's negligence was a proximate cause of Gehlken's injuries; but for this breach of duty, Gehlken's injuries would not have occurred.

Defendant has presented insufficient evidence to support the allegations in  its Answer that: (1) Gehlken failed to pay attention to its alleged warning that the monkey's

fist was about to be thrown (there was no warning); (2) Gehlken was not struck in the head with the monkey's fist (he was struck in the head with the monkey's fist); and (3) Gehlken was to blame, in part or whole, for being hit with the monkey's fist (he was not to blame). To the contrary, it is virtually uncontested that Gehlken was struck in the head with a monkey's fist and that he did not receive a clear and understandable warning from Detyens that a monkey's fist was going to be thrown near him.

As a direct result of defendant's failure to exercise the proper degree of skill required, Gehlken sustained injuries and damages, as discussed below. In making the above findings of fact, reference has been made to pertinent portions of the testimony and exhibits introduced into evidence; however, the court has taken into consideration all of the evidence presented. The court specifically finds the evidence, after considering the appearance, demeanor and qualifications of the witnesses and the testimony as a whole, supports each of its findings by a preponderance of the evidence.

### a.     Jurisdiction

This court has admiralty subject matter jurisdiction pursuant to 28 U.S.C. 1331 over claims for personal injuries that occur on a commercial vessel entering a dry-dock on a navigable river such as the Wando River. These claims meet both the situs and nexus requirements for admiralty tort jurisdiction of this court. Sisson v. Ruby, 497 U.S. 358, 367 (1990); In re Bird, 794 F.Supp. 575 (D.S.C. 1992); Nicholes v. M/V MAYA, 949 F.Supp. 391 (D.S.C. 1996). Because plaintiffs' claims are within this court's admiralty jurisdiction, they are governed by the substantive admiralty law. East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 864 (1986); Byrd v. Byrd, 657 F.2d 615, 617 (4th Cir.1981); Nicholes, 949 F. Supp. at 397.

-13-

**b.**     **Negligence**

Plaintiffs' Complaint is based on their allegations that defendant's negligence caused plaintiffs' injuries.  Negligence is an actionable wrong under the general maritime law.  Leathers v. Blessing, 105 U.S. (15 Otto) 626, 630 (1882).  The elements of a maritime negligence cause of action are essentially the same as land-based negligence under the common law.  Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 630 (1959).  In order to establish negligence in a maritime personal action, plaintiffs must establish: (1) the existence of a duty required by law that obligates a person to conform to a certain standard of conduct in order to protect another against unreasonable risks of harm; (2) a breach of that duty by engaging in conduct that falls below the applicable standard; (3) a causal connection between the improper conduct and the resulting injury, or that the offending conduct was the proximate cause of the injury; and (4) an actual loss or injury due to the improper conduct.  Schumacher v. Cooper, 850 F. Supp. 438, 447 (D.S.C. 1994).  Plaintiffs have the burden of proof in a maritime negligence cause of action.  Id.

In its broadest terms, the general maritime law imposes a duty to exercise reasonable or ordinary care under the circumstances, including the duty to warn of foreseeable dangers and to not injure someone.  See McMellon v. U.S., 338 F.3d 287, 298 (4th Cir. 2003); Bubla  v. Bradshaw, 795 F.2d 349, 353 (4th Cir. 1986); Daigle v. Point Landing, Inc., 616 F.2d 825, 827 (5th Cir. 1980); Spanik v. Dawe Contracting Corp., 226 F.Supp. 951 (D.Md. 1964); see also 1 Thomas J. Schoenbaum, Admiralty & Maritime Law § 5-2 (3d ed. 2001) ("A duty of care exists when injury is foreseeable . . . .").  An agreement existed between defendant and Gehlken's employer, McAllister, for

-14-

the M/V BARBARA MCALLISTER to be repaired in defendant's dry-dock on the Wando River. As part of this agreement, the tug was required to enter and be safely secured to the dry-dock. Under the general maritime law, defendant owed a duty to McAllister's employees, including Gehlken, to not injure them and to warn them of any potential dangers.

The factual findings reflect that the duty in this case requires a dry-dock operator, such as defendant, whose employees will be throwing a monkey's fist from the dry-dock to a tug not to hit anyone and furthermore to provide proper warnings to people like Gehlken. Lovell, Saunders and Alston all admitted that they had a duty to warn Gehlken that a monkey's fist was going to be thrown from the dry-dock to the tug and a duty to not hit him with a monkey's fist. Defendant's employees violated their duty to Gehlken by not properly warning him that the monkey's fist was about to be thrown, by not waiting for him to signal that he was ready to receive it, and by striking him in the head with the monkey's fist.

While the facts are somewhat different, the case of Spanik v. Dawe Contracting Corp., 226 F. Supp. 951 (D.Md. 1964) is illustrative. In Spanik, a ship's carpenter was standing on the deck of a vessel when a vessel cleaning contractor's employee became aware that a monkey's fist attached to a heaving line was stuck. Spanik, 226 F.Supp. at 952. Although the ship's carpenter was standing almost directly between the contractor's employee and the monkey's fist, the contractor's employee, without warning the vessel repairer, pulled hard on the line, which freed the monkey's fist and projected it rapidly through the air. Id. The monkey's fist struck the vessel repairer on the right temple. Id. The Spanik court found that the contractor's employee was negligent in not realizing that

-15-

his acts involved "an unreasonable risk of causing an invasion of an interest of another." Id.

Similarly, this court finds defendant's employees knew or should have known that a person standing on the deck of the tug when monkey's fists were thrown from the wing walls would be in danger. For example, the line handlers were all aware that the monkey's fist was composed of a weighted piece of lead; that sometimes the monkey's fist does not land in the correct spot (Tr. 934); that it is defendant's policy to throw monkey's fists so that they land well away from anyone standing on the deck (Tr. 461); and that there were no radio communications between defendant's employees and the McAllister employees on the tug. It was foreseeable that an errant monkey's fist could strike someone standing on the deck of the tug and that anyone on the deck of the tug would face an unreasonable risk of harm in the event that they were not properly warned by defendant that a monkey's fist was about to be thrown in their vicinity. A warning of such a hazardous operation would have been a reasonable precaution under all of the circumstances involved, and defendant had a duty to exercise reasonable care to avoid injury to persons who could reasonably be expected to be on the deck of the tug.

This court further concludes that Gehlken has met his burden with regard to the element of proximate causation. "[A] plaintiff must demonstrate that a defendant's breach of duty proximately caused the plaintiff's injury." Schumacher v. Cooper, 850 F. Supp. 438, 451 (D.S.C. 1994). In order for Gehlken to meet this burden with respect to causation, he must demonstrate factual and proximate causation between the alleged breach of duty and the resulting injuries. Gehlken has satisfied this burden by a preponderance of the evidence.

-16-

Gehlken's assertion that he was struck in the head by the monkey's fist on the day the tug was being dry-docked is supported by the testimony of Davis and the other McAllister employees located on the tug.  All of these witnesses testified that Gehlken told them either during or shortly following the completion of the dry-docking that he had been struck in the head with a monkey's fist.  (Tr. 561-63, 607-08.)  Davis testified that Gehlken told him that he had been struck in the head with a monkey's fist within minutes of it occurring, and he stated that Gehlken had a red mark on his forehead.  (Tr. 598, 599, 601, 602.)

The testimony of Drs. Walker, Waid  and Wilson  supports the determination that Gehlken's ongoing problems are the result of being hit by the monkey's fist.  Drs. Walker, Waid  and Wilson all testified that Gehlken suffered a traumatic blow to his head that resulted in PTC, and they all detailed Gehlken's chronic medical problems.

This court has considered defendant's claim that Gehlken's PTC was not caused by a monkey's fist striking his head.  Defendant's expert neurosurgeon, Dr. Curtis Worthington, offered an inconclusive opinion regarding the nature of Gehlken's head injury, related symptoms, and the cause of those symptoms.  During cross examination, Dr. Worthington testified that he did not know if Gehlken had or didn't have PTC.  (Tr. 1013, 1018, 1041.)  In addition, Dr. Worthington testified that there is no evidence that Gehlken was malingering nor was there any issue of secondary gain.  (Tr. 1023.)

Defendant offered the testimony of Dr. J. Gilbert Baldwin for the purposes of establishing that Gehlken's PTC pre-existed his head injury.  Dr. Baldwin based his opinion on his presumption that Gehlken suffered from multiple medical conditions that can cause signs, symptoms and findings of PTC.  (Tr. 965.)  However, under cross-

examination, Dr. Baldwin acknowledged he was not a specialist in this area.  (Tr. 971-72.)  Additionally, he admitted he had referred several patients to Dr. Walker for confirmation and treatment of PTC.  Dr. Baldwin also stated that Dr. Walker was fully capable of diagnosing and treating PTC.  (Tr. 972.)

Dr. Baldwin admitted that even mild head trauma can cause the onset of PTC based upon an article published in Archives in Neurology entitled, "Pseudo-tumor Cerebri in Men".  (Tr. 978-79.)  He admitted that Gehlken's dizziness, headaches, nausea and blurred vision within hours of being hit by the monkey's fist, (Tr. 988-89), were all consistent with a closed head injury as diagnosed by Drs. Walker, Wilson and Waid.  In light of Dr. Baldwin's lack of expertise in neurology, neuropsychology or neuro-ophthalmology, this court places greater weight upon the testimony of Drs. Walker, Wilson and Waid in determining the cause of Gehlken's PTC.  However, as noted in paragraph 29, Dr. Worthington is the only doctor who is qualified to opine on Gehlken's suitability for surgical intervention.

### c.    **Comparative Negligence**

Since jurisdiction is premised upon admiralty, federal common law governs.  As such, the doctrine of comparative negligence applies.  See, e.g., Mullenix v. United States, 984 F.2d 101, 104 (4th Cir.1993) (citing United States v. Reliable Transfer Co., 421 U.S. 397, 407, 411, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975)); Hurd v. U.S., 134 F.Supp.2d 745 (D.S.C.. 2001), aff'd  Hurd v. U.S., 34 Fed.Appx. 77, 2002 A.M.C. 1584 (4th Cir. 2002).  Thus, in the context of an admiralty case, damages should "[b]e allocated among the parties proportionately to the comparative degree of their fault." Reliable Transfer Co., Inc. 421 U.S. at 411, 95 S.Ct. 1708.

Defendant strenuously argues that Gehlken's inattention was a contributing factor to his injury.  Gehlken was neither informed by defendant when the line handling operations would begin, nor did he have any duties relating to the exchange of the lines. He was properly upon the tug, the property of his employer, and entitled to assume that defendant's employees would warn him to move before they began an operation that would endanger him.  In addition, given the noise in the dry-dock at the time of the dry-docking and defendant's failure to use a public address system, VHF radio, or some other means to warn that a monkey's fist was about to be thrown, Gehlken did not cause, or contribute to the cause, of this accident.  Additionally, the monkey's fist should not have been thrown anywhere near Gehlken's position on the tug and should have landed on or very near to the drying rack, which was over fifteen (15) feet away from Gehlken's position.  Therefore, this court concludes that Gehlken's conduct did not contribute to his injuries.

### d.     Detyens' Liability is Not Reduced by McAllister's Negligence

Likewise, defendant's liability is not reduced by any alleged negligence of McAllister.  The U.S. Supreme Court in Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 411-13 (1953) addressed this issue and held that tortfeasors such as defendant are not entitled to have their liability reduced by the fault of the employer, as the employer has a statutory lien under the LHWCA on the injured employee's recovery.  Pope & Talbot, Inc., 346 U.S. at 411.  In rejecting the third party tortfeasor's contention that it would be unconscionable to reward an employer whose negligence contributed to the injury by not reducing the tortfeasor's liability, the Court held a "weakness in this ingenious argument is that Section 3 of the Act has specific provisions to permit an employer to recoup his

-19-

compensation payments out of any recovery from a third person negligently causing such injuries." Id. at 412.  The Supreme Court recognized that if the tortfeasor's contention was accepted, "it would frustrate this purpose to protect employers who are subjected to absolute liability by the Act." Id.  "Moreover, reduction of the [torfeasor's] liability at the expense of [the employee] would be the substantial equivalent of contribution which we declined to require in Halcyon." Id.[3]

Defendant claims that a settlement was reached between the Gehlkens and McAllister, and pursuant to McDermott, Inc. v. AmClyde and River Don Castings Ltd., 511 U.S. 202 (1994) its liability should be reduced by the percentage of McAllister's negligence.  McDermott is inapplicable under the facts of this case as Detyens did not submit any evidence that a settlement between McAllister and the Gehlkens was consummated.

Even assuming Gehlken reached a settlement with McAllister, the LHWCA does not permit Gehlken to maintain an action against McAllister and limits his claim to worker's compensation benefits.  Section 905(b) of the LHWCA  permits employees to sue the owner or operator of a "vessel" for negligence.  33 U.S.C. § 905(b).   Section 905(b) reads "In the event of injury to a person covered under this Act caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party . . . ." (emphasis added).  The term "vessel" under the LHWCA is defined "said vessel's owner,

---

[3]  In Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282 (1952), the Supreme Court held that a shipowner who was required to pay an injured worker damages was not entitled to contribution  from an employer who was a joint tortfeasor in causing the damages.

owner pro hac vice, agent, operator, charter[er] or bare boat charterer, master, officer or crew member." 33 U.S.C. § 902(21).  Section 905(b) of the LHWCA prohibits an employee from filing suit against his employer where the employee "was employed to provide shipbuilding, repairing, or breaking services and such persons's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel." 33 U.S.C. § 905(b).  If an employee is "hired to restore a vessel to a safe operating condition, he has been hired to perform 'repairing services under § 905(b) and may not maintain a claim against the employer as a vessel owner.  New v. Assoc'd Painting Services, Inc., 863 F.2d 1205, 1210, 1990 AMC 1126 (5th Cir. 1989)("if he is hired to restore a vessel to safe operating condition, he has been hired to perform "repairing . . . service under §905(b).  If, however, he is hired to preserve the vessel's current condition, he is performing routine maintenance not covered by the section.").

As testified to by Gehlken and Davis, Gehlken's job was to perform both repair work and maintenance on McAllister's vessels.  Gehlken was a vessel repairer, which is specifically enumerated in §905(b) as an employee who is not permitted to file suit against his employer in its capacity as a vessel owner or operator.  Gehlken and Davis testified that they boarded the tug to repair the vessel's engine so that it would start.  This type of work is not routine and expected maintenance, and is considered  "repair" work under the LHWCA.  Davis also testified that the majority of Gehlken's duties required him to repair vessels.  As such, Gehlken is considered a vessel repairer under the LHWCA , and he is not permitted by § 905(b) to bring a claim against McAllister in its role as vessel operator.  Therefore, McAllister is not considered a joint tortfeasor, and McDermott is not applicable.

III.     **DAMAGES**

The elements of damages which are properly considered in determining the amount plaintiffs are entitled to recover include: past and future medical expenses, past and future pain and suffering, past and future loss of income and earning power, disfigurement, past and future loss of enjoyment of life, and past and future loss of family services or the performance of household tasks. Schumacher v. Cooper, 850 F. Supp. 438, 449, 1994 AMC 2554 (D.S.C. 1994); Watson v. Wilkinson Trucking Co., 244 S.C. 217, 136 S.E.2d 286 (1964). Although defendant argues that plaintiffs are barred from recovering nonpecuniary damages under Miles v. Apex Marine Corp., 498 U.S. 19 (1990) and its progeny, this court disagrees. See Consolidation Coal Co. v. W.W. Patterson Co., 228 F. Supp. 2d 764, 770-71 (N.D.W.Va. 2001) (holding that, because the plaintiffs could not sue the non-employer defendants under the Jones Act and had to maintain their claim under general maritime law, state remedies were available to supplement general maritime law and non-pecuniary damages were available). Like Consolidation Coal, plaintiffs in this case do not have a Jones Act claim against defendant because defendant was not Gehlken's employer. Instead, general maritime law controls this action against a non-employer third-party. See id. at 771. As the Fourth Circuit itself has noted, "'[w]hen no federal statute or well-established rule of admiralty exists, admiralty law may look to the common law or to state law, either statutory or decisional, to supply the rule of decision.'" Consolidation Coal, 228 F. Supp. 2d at 772 (quoting Princess Cruises, Inc. v. General Elec. Co., 143 F.3d 828, 834 (4th Cir. 1998)). Even though Gehlken may be covered under the Jones Act for claims against his

employer McAllister, the Jones Act does not cover his claims against defendant and non-pecuniary damages are available.

Since there is no exact measurement for pain and suffering, loss of enjoyment of life, and impairment of earning capacity, mathematical precision in ascertaining damages is not required.  Brooks v. United States, 273 F. Supp. 619 (D.S.C.1967).  Prior to being struck in the head with the monkey's fist, Gehlken was a hard worker, and enjoyed an active, normal life in all respects.  (Tr. 8-12, 86; Pls.' Ex. 1.)  He had a strong, normal marital relationship with his wife.  (Tr. 42-45.)  He was a father and grandfather. (Tr. 6-7.)  He also enjoyed the company of his friends and family, was an active church member, and was fully engaged in recreational activities including boating, fishing, coaching American Legion baseball, church sponsored missions, programs, and conventions. (Tr. 8-12, 42- 45, 87-89, 766-68, 777-79.)  He had an active social and work life.  He was also an artist who created and sold his metal sculptures.

Due to Gehlken's headaches, nausea, loss of balance, shoulder pain, back pain, vision loss, kidney stones, and other medical problems, it is clear that he has suffered and continues to suffer excruciating pain.[4]  This pain was proximately caused by defendant's negligence.  As such, the undersigned finds Gehlken is entitled to an award to compensate him for present, past and future pain and suffering.  According to S.C. Code Ann.§19-1-150, he is projected to have a life expectancy of 21.450 years on date he was injured.  The court awards him $300,000.00 for past and future pain and suffering.

---

[4]  Defendant's expert, Dr. Worthington, testified that the passing of kidney stones was a "terrible thing."  (Tr. 1045.)

As a result of defendant's negligence, Gehlken has endured mental anguish as a result of his injuries, including: the ongoing frustration of not being able to function in the same manner as he could prior to being injured and the reduction of his self confidence and image due to his not being able to work.  He is no longer able to enjoy hobbies, attend church conferences, prayer groups and meetings, and other activities.  He is entitled to an award for mental anguish as well.  The court awards him $100,000.00 for past and future mental anguish.

As a direct result of defendant's negligence, Gehlken is no longer able to participate in hobbies and family events due to defendant's negligence.  He has trouble communicating, is lethargic, can no longer fish, go boating, create his metal sculptures, attend art shows, attend church conferences, attend church missions, nor can he participate in other hobbies and activities that he enjoyed before he was injured.  This entitles him to an award for loss of enjoyment of life.  The court awards him $175,000.00 for loss of enjoyment of life.

Over two and a half years after the accident, Gehlken still has not been able to return to full time employment.  Robert E. Brabham, Ph.D., a psychologist and expert vocational rehabilitation counselor, testified that Gehlken's long-term vocational prognosis is poor, especially because of his age, and that he will not be able to return to full-time gainful employment.  Dr. Brabham testified  that as a direct result of Gehlken's injury and limited job skills, he is totally disabled from returning to work.  Defendant did not present any evidence to contradict Dr. Brabham.

Gehlken is entitled to recover past and future wages from the date of his accident through his work life expectancy, age 66, when he would receive normal Social Security

retirement benefits.  At the time of the accident, Gehlken's pay with McAllister was $35,274.00, plus fringe benefits that included retirement, health insurance, and dental insurance.  (Pls.' Ex. 25-G.)  One of his hobbies was creating sculptures out of metal.  Due to his accident, he can no longer make and sell his metal sculptures.  Additionally, Gehlken is unable to perform maintenance and repairs to his house, as well as other personal services.  (Tr. 48, 49, 50.)  Gehlken also lost the dental and health insurance provided by his employer.  (Tr. 884-85.)  According to Perry B. Woodside, III, Ph.D., plaintiffs' expert economist, Gehlken suffered a total net loss in earnings of $270,675.00, loss of personal services of $55,049.00, and loss of health and dental insurance in the amount of $15,185.00.  (Pls.' Ex. 30.)  Due to defendant's negligent conduct, Gehlken has suffered economic damages and is entitled to loss in earnings of $270,675.00, loss of personal services of $55,049.00 and loss of  health and dental insurance in the amount of $15,185.00.  (Pls.' Ex. 30.)

        According to the Medical Bill Summary (Pls.' Ex. 26-A), Gehlken's past medical expenses as a result of the defendant's negligence are $21,058.00.[5]  These medical expenses were incurred as a direct result of defendant's negligence as well.  Thus, Gehlken is entitled to recover $21,058.00 for past medical expenses.

        As testified to by Drs. Walker, Wilson and Waid, Gehlken will need future medical care.  Gehlken testified that he is producing and passing numerous kidney stones

_____

        [5] Although Dr. Woodside calculated Gehlken's past medical expenses as $21,058.00, plaintiffs argue in their proposed order that they are entitled to $36,493.66.  Because they did not offer any evidence at trial regarding the $15,435.66 discrepancy, this court awards past medical expenses as determined by Dr. Woodside.

-25-

on a daily basis.  Gehlken's chronic production of kidney stones and the physical problems addressed in paragraph 35 are permanent in nature.

Dr. Walker was of the opinion that if the Diamox continues to cause Gehlken to have chronic kidney stones, he will need surgery to have a VP shunt placed in his head in order to relieve pressure.  However, based on the testimony of board-certified neurological surgeon Dr. Worthington, this court finds that Gehlken is not a candidate for this surgery.

Plaintiffs called Cheryl Mathis, a certified life-care planner, to testify about Gehlken's future medical expenses.  Ms. Mathis opined that Gehlken would require future medical care for the rest of his life.  She presented a "life-care plan" (Pl.'s Ex. 29), which she testified was based on treatment recommendations made by Gehlken's treating physicians.

Based upon Dr. Walker's testimony, the Life Care Plan of Mathis (Pls.' Ex. 29), Dr. Walker's correspondence dated March 21, 2006 (Pls.' Ex. 35) and Dr.Woodside's summary contained in Table 2 (Pls.' Ex. 30), Gehlken will need medications for the rest of his life at a cost of $126,885.00.

Ms. Mathis also testified about the total future life time medical costs that would likely be incurred by Gehlken due to his injuries and defendant's negligent conduct.  Dr. Woodside reduced these expenses to present value.  (Tr. 879-80.)  The present value of the future medical care and expenses as set forth in Dr. Woodside's summary contained in Table 2 (Pls.' Ex. 30) is $331,509.00.  Gehlken is entitled to future medical care and expenses and that the future medical expenses listed in Plaintiffs' Exhibit 30 are causally

connected to Detyens' negligence.  Damages for future medical care and expenses total $331,509.00, which includes future medications at a cost of $126,885.00.

As Gehlken's wife, Carole Gehlken is entitled to recover a sum of money that will reasonably compensate her for her loss of consortium under the general maritime law.  Schumacher v. Cooper, 850 F.Supp. 438, 449, 1994 AMC 2554  (D.S.C 1994); Emery v. Rock Island Boat Works, Inc., 847 F.Supp. 114, 116 (C.D.Ill.1994). Consortium involves the love and affection; the companionship and society; the comfort, aid, advice, and solace; the rendering of material services; and any other elements that normally arise in a close, intimate, and harmonious marriage relationship.  Id.; Ozzello v. Peterson Builders, Inc., 743 F.Supp. 1302, 1315 (E.D.Wis.1990); Am. Exp. Lines, Inc. v. Alvez, 446 U.S. 274 (1980) (holding the wife of an injured longshoreman has an independent cause of action for loss of society).

As a result of this incident, Donald and Carole Gehlken's marital relationship has suffered.  She is now required to provide him with care and assistance, pick up his prescriptions and accompany him to numerous doctors' visits.  Evidence presented at trial shows that Carole Gehlken has experienced a reduction in the love, affection, care, attention and companionship of her husband, which was caused by his injuries and which will continue for the rest of his life.  Due to Mr. Gehlken's injuries, the Gehlkens no longer attend art shows, church conventions, prayer groups, and church missions together.  Mr. Gehlken's injures also prevent them from having normal marital relations. Mrs. Gehlken is entitled to an award of $175,000.00 for loss of her husband's society.

In admiralty cases, a district court has discretion to award prejudgment interest and should award prejudgment interest, unless the limited exception for "peculiar" or

"exceptional" circumstances exists.  <u>City of Milwaukee v. Cement Division, National</u>

<u>Gypsum Co.</u>, 115 S.Ct. 2091, 2095-96 (1995); <u>Yarmouth Sea Products Ltd. v. Scully</u>,131

F.3d 389, 395 (4th Cir. 1998)(award of prejudgment interest affirmed); <u>Noritake Co., Inc.</u>

<u>v. M/V Hellenic Champion</u>, 627 F.2d 724 (5th Cir. 1980).  This is an action instituted

under the district court's admiralty jurisdiction and no peculiar or exceptional

circumstances existed that would prevent the Gehlkens from recovering pre-judgment

interest.  This court, in its discretion, finds no such peculiar circumstances here and finds

that plaintiffs are entitled to pre-judgment interest from the date of the accident until the

date of this order.

## IV.     CONCLUSION

 For the reasons stated above, it is therefore ORDERED that plaintiffs are entitled

to an award as follows:

| | | |
|---|---|---|
| a. | Past medical expenses | $    21,058.00 |
| b. | Future medical expenses | $  331,509.00 |
| c. | Lost future earnings | $  270,675.00 |
| d. | Loss of personal services | $    55,049.00 |
| e. | Loss of health and dental insurance | $    15,185.00 |
| f. | Pain and suffering (past and future) | $  300,000.00 |
| g. | Mental anguish (past and future) | $  100,000.00 |
| h. | Loss of enjoyment of life (past and future) | $  175,000.00 |
| i. | Loss of consortium for Carole Gehlken (past and future) | $  175,000.00 |

TOTAL DAMAGES

$1,443,476.00[6]

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT COURT JUDGE**

**January 29, 2007**
**Charleston, South Carolina**

---

[6] Plus pre-judgment interest at the prevailing rate.